# EXHIBIT A

CAUSE NO. 22-2639-431

| | | |
|---|---|---|
| DJO GLOBAL, INC., | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | __ JUDICIAL DISTRICT |
| | § | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | § § | |
| | § | |
| *Defendant.* | § | DENTON COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION

This is an action brought by Plaintiff DJO Global, Inc. ("DJO") seeking damages from Defendant National Union Fire Insurance Company of Pittsburgh, PA ("AIG") for AIG's breach of contract arising from AIG's failure to fulfill its contractual obligations to DJO under a Specialty Risk Protector insurance policy (the "Policy"). DJO also seeks it attorney's fees. In direct violation of the terms of the Policy, AIG has impermissibly limited coverage and refused to compensate DJO fully for the loss costs and expenses it incurred as a result of an external ransomware cyberattack (the "Cyberattack"), which affected DJO's computer network assets.

## DISCOVERY LEVEL

1.  DJO intends that discovery be conducted pursuant to Level 3 of Tex. R. Civ. P. 190.4.

## RULE 47(c) DISCLOSURE – RELIEF SOUGHT

2.  Pursuant to Tex. R. Civ. P. 47(c), DJO seeks monetary relief over $1 million.

## THE PARTIES

3.  DJO is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Lewisville, Texas. DJO is a medical device company with more than 5,000 employees, more than 12 facilities around the world, and has over

1

1,000 devices in its product range, including orthopedic medical devices and surgical implants for shoulders, hips, knees, feet, and ankles.

4. Upon information and belief, AIG is a corporation organized and existing under the laws of the State of Pennsylvania with a principal place of business in New York. AIG may be served with process by delivering a citation and a true and correct copy of this petition to its registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over AIG because it transacted business in the State of Texas, it is registered to conduct business in the State of Texas, and it provides insurance in the State of Texas.

6. This Court has jurisdiction over the subject matter of this dispute pursuant to art. 5 of the Texas Constitution and because the amount in controversy exceeds $500. Tex. Gov't Code § 24.007.

7. Venue is proper in Denton County pursuant to Tex. Civ. Prac. & Rem. Code § 15.002(a)(4) because DJO resided in Denton County at the time of the accrual of the cause of action.

## FACTUAL BACKGROUND

**I.     THE POLICY**

8. AIG's Policy is numbered 01-540-24-90 and covers the policy period June 30, 2020 to June 30, 2021. The Policy contains numerous coverage sections, two of which are applicable here: (a) Network Interruption Insurance; and (b) Event Management Insurance. The Policy provides a Limit of Liability of $10 million.

    **A.**    <u>**Network Interruption Insurance Coverage Section**</u>

9. The Network Interruption Insurance contains a $10 million sublimit, subject to a $100,000 retention.

10. By Endorsement No. 9, Network Interruption Insurance is subject to a 10-hour Security Failure Waiting Hours Period and an 8-hour System Failure Waiting Hours Period.

11. The Policy also contains a 180-day "Extended Period of Indemnity."

12. The insuring agreement for the Network Interruption Insurance coverage provides:

> With respect to the **NETWORK INTERRUPTION INSURANCE AGREEMENT** of this Clause 1., solely with respect to a **Security Failure** or **System Failure** first occurring during the **Policy Period** and reported to the **Insurer** pursuant to the terms of the policy, this **Network Interruption Coverage Section** affords the following coverage:
>
> **NETWORK INTERRUPTION INSURNING AGREEMENT**
>
> The **Insurer** shall pay all **Loss** sustained by an **Insured**, in excess of the **Remaining Retention**, after the **Waiting Hours Period** and solely as a result of a **Security Failure** or a **System Failure**.

13. In the Network Interruption Insuring Agreement, the Policy defines **Loss** as "the actual **Business Income Loss, Expenses to Reduce Loss, Extra Expenses** and **Proof of Loss Preparation Costs** sustained or incurred by an **Insured**."

14. The Policy further defines **Business Income Loss** as

> the sum of the following incurred during the **Period of Indemnity** and the **Extended Period of Indemnity** (if any):
>
> (1) net profits that would have been earned but for the **Material Interruption** (after charges and expenses, but not including any capital receipts, outlays properly chargeable to capital, and deductions for taxes and profits); and
>
> (2) charges and expenses which necessarily continue (including ordinary payroll.

3

15. The Policy defines **Extra Expenses** as the "expenses incurred by the **Insured** during the period of Indemnity or the Extended Period of Indemnity (if any), other than **Expenses to Reduce Loss**, that would not have been incurred but for a **Material Interruption**."

16. Endorsement No. 9 defines **System Failure** as "any unintentional and unplanned outage of a **Computer System** that is not part of or caused by a **Security Failure**."

17. The Policy defines **Security Failure** as "a failure or violation of the security of a **Computer System**, including, without limitation, that which results in or fails to mitigate any unauthorized access, unauthorized use, denial of service attack or receipt or transmission of malicious code."

18. The Policy states that **Security Failure** "includes any such failure or violation resulting from the theft of a password or access code from a **Company's** premises, a **Company's Computer System**, or an officer, director or employee of a **Company** by non-electronic means."

19. The Policy defines **Material Interruption** as

> (1) the partial or total interruption, suspension or impairment of an **Insured's** business directly caused by a **Security Failure** or **System Failure**; or
>
> (2) the necessary, partial or total, interruption or suspension of an **Insured's** business directly caused by a **Voluntary Shutdown**.

B. **Event Management Coverage Section**

20. The Event Management Insurance coverage section contains a $10 million sublimit, subject to a $100,000 retention.

21. The basic insuring clause of the Event Management Insurance coverage section provides:

> With respect to the **EVENT MANAGEMENT INSURING AGREMENT** of this Clause 1., solely with respect to a **Security Failure** or **Privacy Event** first discovered during the **Policy period** and reported to the Insurer pursuant to the terms of this policy, this

4

**Event Management Coverage Section** affords the following coverage:

**EVENT MANAGEMENT INSURING AGREEMENT**

The **Insurer** shall pay all **Loss**, in excess of the applicable Retention, that an **Insured** incurs solely as a result of the alleged **Security Failure** or **Privacy Event** that has actually occurred or reasonably believed by such **Insured** and the **Insurer** to have occurred.

22. The Event Management Insurance coverage section contains the same definition of **Security Failure** as the Network Interruption Insurance coverage section.

23. **Privacy Event** is defined as, including "any failure to protect **Confidential Information** . . . ."

24. In the Event Management Insurance coverage section, **Loss** is defined as:

the following reasonable and necessary expenses and costs incurred by an **Insured** within one year of the discovery of the **Security Failure** or **Privacy Event**

(1) to conduct an investigation (including a forensic investigation) to determine the existence, cause and scope of the **Security Failure** or **Privacy Event**; provided, however, that solely with respect to a payment of card forensic investigation ("PFI"), **Loss** means the expenses and costs described above with are incurred by an **Insured** within eighteen (18) months of the discovery of the **Security Failure** or **Privacy Event**.

(2) for a public relations firm or crises management firm, appointed or agreed to by the **Insurer**, to advise an **Insured** on minimizing the harm to such **Insured** . . .

(3) for a law firm, appointed or agreed to by the **Insurer**, to advise an **Insured** on (a) minimizing the harm to such **Insured**; (b) regarding the course of action that is legally required or appropriate to respond to the **Security Failure** or **Privacy Event**; and (c) on the appropriate content, scope and distribution of any notice to consumers, government agencies or other interested parties concerning **Security Failure** or **Privacy Event;**

(4) to notify those individuals and entities whose **Confidential Information** is reasonably believed to be the subject of the **Security**

5

**Failure** or **Privacy Event** and to advise of any available remedy in connection with the **Security Failure** or **Privacy Event**, including, without limitation, those expenses and costs for printing, advertising and mailing of materials;

(5) for identity theft education and assistance, identity theft call center services, credit file or identity monitoring, identity theft restoration services and victim expenses reimbursement insurance made available to those persons notified about the **Security Failure** or **Privacy Event** pursuant to subparagraph (3) above;

(6) for any other services approved by the **Insurer** at the **Insurer's** sole and absolute discretion;

(7) to restore, recreate or recollect **Electronic Data**; or

(8) to determine whether **Electronic Data** can or cannot be restored, recollected or recreated.

Provided, however, Loss shall not include compensation, fees, benefits, overhead or internal charges of any **Insured**.

## II.   THE CYBERATTACK

25.     The Cyberattack occurred on or about November 8, 2020, during the policy period of the Policy. It was an external ransomware cyberattack that affected DJO's computer network assets.

26.     As a result of the Cyberattack, most Windows product files on 300 servers and certain PCs connected to DJO's computer network were encrypted by malware and unable to be accessed or used.

27.     The Cyberattack impacted DJO's network assets that contained data that related to production operations, commercial efforts, and financial activities. These are critical processes that support DJO's ability to operate.

28.     As part of DJO's response plan, DJO brought in pre-arranged forensic consulting resources to minimize the spread of the ransomware and to manage the remediation. Additionally,

DJO engaged legal counsel and other consultants to work with DJO to manage and minimize the impact of the Cyberattack.

29. The Cyberattack caused significant disruption across all of DJO's business units, including both domestic and international operations. In some cases, systems could not be rebuilt on existing hardware and software, and replacement products needed to be purchased. Most business units required four to six weeks to fully recover from the date of discovery. Even though DJO employed manual workarounds, DJO suffered loss of revenues and increased operating expenses.

30. Among other things, DJO incurred losses because of the Cyberattack in the form of: (a) incident responses services, including forensic investigation, remediation, rebuild, and recovery management services; (b) legal counsel; (c) technology, software, and hardware replacement; (d) business interruption losses; (e) professional fees to develop the business interruption claim; and (f) credit monitoring services.

### III.     AIG REFUSES TO COVER ALL OF DJO'S LOSSES

31. DJO gave AIG prompt notice of the Cyberattack to AIG (the "Claim").

32. On January 21, 2021, DJO submitted to AIG preliminary proof of loss for the Claim detailing the direct costs incurred by DJO in response to the Cyberattack, and informed AIG that it was still developing its business interruption model with external forensic support and that it expected to provide AIG with the business interruption details in February 2021.

33. Thereafter, DJO submitted to AIG further information supporting more than $6 million in losses, costs, and expenses incurred in connection with the Cyberattack, including 23 different schedules containing numerous data points for DJO's various business units. After receiving DJO's proof of loss and business income loss information, AIG retained RSM US LP

("RSM") as its forensic accountant and consultant and handed the adjustment of the Claim over to RSM.

34. Thereafter, RSM began to seek voluminous information from DJO to stymie the adjustment of the Claim.

35. Each time DJO would provide information requested by AIG or RSM, AIG and RSM would respond by requesting additional information.

36. DJO, and its own forensic accountant, have responded to AIG's and RSM's voluminous information requests, including making DJO's employees and consultants available to AIG to address any questions posed by AIG.

37. Unfortunately, DJO's cooperation has not led to a prompt and efficient adjustment of the Claim and, more to the point, it has not led to a prompt payment of the insurance proceeds owed to DJO.

38. Rather than accept coverage and pay the claim, AIG has stonewalled.

39. AIG also has taken inconsistent positions with respect to the Claim. For example, AIG accepted certain of DJO's loss calculations and methodologies when they resulted in AIG paying less money than even AIG's consultants acknowledged AIG owed for those categories, but then AIG rejected other of DJO's loss calculations based on similar loss methodologies when they resulted in AIG owing more money.

40. Although DJO spent the better part of a year educating AIG and RSM on its Claim calculations, AIG has refused or failed to pay what is owed under the Policy.

41. Rather, eighteen months after the Cyberattack, AIG only has agreed to pay a portion of DJO's losses, costs, and expenses that are covered under the Policy and owed by AIG.

42. Moreover, AIG has not even paid all amounts that AIG agrees is owed under the Policy. More than $3 million that AIG agreed is due under the Policy still has not been paid to DJO.

43. The following chart shows (1) amounts that DJO submitted to AIG for payment with respect to various categories of coverage available under the Policy, (2) amounts that AIG agreed to pay, and (3) amounts that, to date, AIG has actually paid:

| Category | Amount Submitted | Amount Agreed To | Amount Paid |
| --- | --- | --- | --- |
| Business Interruption | $2,700,911 | $2,076,215 | $0.00 |
| Extra Expense | $1,490,422 | $649,967 | $0.00 |
| Event Management | $1,952,444 | $1,617,637 | $1,273,026 |
| TOTAL | $6,143,777 | $4,343,819 | $1,273,026 |

44. AIG's Policy requires DJO to mediate all disputes under the Policy before pursuing a lawsuit for coverage under the Policy. Thus, DJO was forced to incur legal fees and costs to mediate with AIG before it could bring this lawsuit to remedy AIG's breach of contract.

45. The parties did not resolve their disputes at mediation, and AIG continues to be in breach of its contractual obligations owed under the Policy.

46. Because DJO has been unable to resolve the Claim, and its cooperation with AIG has gone unreciprocated, DJO is forced to initiate this proceeding.

## CAUSES OF ACTION

### Count I – Breach of Contract

47. DJO repeats and realleges the allegations in Paragraphs 1 through 46 as if set forth herein.

48. Under the terms of the Policy, DJO is entitled to coverage for Business Interruption Losses, Extra Expenses, and Event Management Losses caused by the Cyberattack.

49. All conditions precedent to AIG's obligation to pay the Claim have been met.

50. DJO has paid all premiums owed under the Policy.

51. DJO has performed any and all obligations it has under the Policy.

52. Despite due and repeated demands, AIG has failed to pay what is owed to DJO under the Policy for Business Interruption Losses, Extra Expenses, and Event Management Losses caused by the Cyberattack.

53. As a result of AIG's breach of its obligation to fully pay all Business Interruption Losses, Extra Expenses, and Event Management Losses caused by the Cyberattack and due under the Policy, DJO has incurred damages in an amount to be determined at trial, plus pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

54. In addition, DJO is entitled to recover its reasonable and necessary attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code § 38.001, *et seq.*

## ATTORNEY'S FEES

55. DJO repeats and realleges the allegations in Paragraphs 1 through 54 as if set forth herein.

56. Due to AIG's failure to fully pay all amounts due to DJO under the Policy, DJO was forced to retain legal counsel to pursue coverage for the Claim under the Policy.

57. DJO presented the Claim to AIG and AIG failed to tender timely payment.

58. DJO is entitled to an award of its reasonable attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code § 38.001, et seq., because this claim is brought in connection with a written contract.

## CONDITIONS PRECEDENT

59.     All conditions precedent to filing this lawsuit and bringing the claims asserted herein have been performed, have occurred, have been waived, have been excused, or would be futile. Alternatively, AIG is estopped from enforcing any such conditions.

## JURY TRIAL DEMAND

60.     Pursuant to Tex. R. Civ. P. 216, DJO demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, DJO respectfully requests that this Court grant it the following relief:

a.      Judgment awarding DJO all damages it has suffered as a result of AIG's breach of the Policy;

b.      Judgment awarding DJO all reasonable and necessary attorney's fees and expenses incurred in connection with this matter and DJO's pursuit of insurance coverage due under the Policy;

c.      Judgment awarding DJO pre-judgment and post-judgment interest in the amount allowed by law;

d.      Judgment awarding DJO all costs of court; and

e.      Such other and further relief as is equitable and just, both at law and in equity, as DJO may show itself justly entitled.

Date: April 3, 2022

        Respectfully submitted,

        By: */s/Ryan D. Marrone*
        Ryan D. Marrone
        State Bar No. 24094567

        **FERGUSON BRASWELL FRASER KUBASTA PC**
        2500 N. Dallas Parkway, Suite 600
        Plano, Texas 75093
        Tel. 972.378.9111
        Fax 972.378.9115
        rmarrone@fbfk.law

        **ATTORNEY FOR DJO GLOBAL, INC.**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 63208396
Status as of 4/4/2022 1:52 PM CST

Associated Case Party: DJO Global, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ryan D.Marrone | | rmarrone@fbfk.law | 4/3/2022 12:01:38 AM | SENT |
| Staci Bednarski | | sbednarski@fbfk.law | 4/3/2022 12:01:38 AM | SENT |